O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

MICHAEL LANCASTER,

               Petitioner,

       v.

KIM HOLLAND, Warden,

               Respondent.

Case No. CV 15-5496-KES

MEMORANDUM OPINION AND ORDER

## I.

## BACKGROUND

On July 20, 2015, Petitioner Michael Lancaster ("Petitioner") filed a Petition for Writ of Habeas Corpus by a Person in State Custody, pursuant to 28 U.S.C. § 2254. (Dkt. 1.) Petitioner is a California state prisoner currently serving a sentence of 15 years to life for gang-related second degree murder and a consecutive sentence of life with a minimum term of 15 years for gang-related attempted premeditated murder, after a jury found him guilty in 2012

of these crimes.  (Dkt. 1 at 1.[1])

Respondent filed an answer to the Petition on October 5, 2015.  (Dkt. 15).  On December 8, 2015, the Court issued a minute order reminding Petitioner that his traverse was due and extending his filing deadline to January 7, 2016.  (Dkt. 19.)  Petitioner failed to file a traverse.

For the reasons discussed below, the Petition is denied and this action dismissed with prejudice.  The California Court of Appeal's denial of relief on these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor based upon an unreasonable determination of the facts presented in state court.  28 U.S.C. § 2254(d).

# I.

# FACTUAL BACKGROUND

The underlying facts are taken from the unpublished California appellate court opinion.  (See Dkt. 16 [Notice of Lodging], Lodged Document ["LD"] 10.)  Unless rebutted by clear and convincing evidence, these facts may be presumed correct.  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1).[2]

*I. Prosecution Evidence*

*A. The Shooting*

*On the evening of December 7, 2008, Stephanie Smith drove her car to the home where her son, Dedric Wallace, was staying with his girlfriend.  Wallace was a member of the 94th Street Hoover gang with the moniker Kool Aid.  In the front passenger seat was Smith's 13-year-old daughter, Shatera Simpson, and in the rear, behind Smith, sat her stepdaughter, Breyanna Chase Simpson.  Wallace's girlfriend, Gretrece Fields, lived*

---

[1]     All page citations are to the electronic CM/ECF pagination.

[2]     Footnotes within the Court of Appeal excerpt are drawn from the Court of Appeal opinion.

*near the intersection of 102nd Street and Denver Street in Los Angeles. Wallace and Fields came out to the car, and Fields stood and spoke with Smith on the driver's side of the car. A champagne-colored car drove by and almost struck Fields.*

*Wallace asked Smith to take him to a gas station so that he could buy a snack. Wallace sat in the rear seat behind Shatera. On the way to the gas station, Breyanna noticed a car flashing its high beams behind them. After Wallace made his purchases, Smith began driving him back to his girlfriend's. Shatera noticed a car with bright lights was following them very closely. Upon arriving at Fields's home, Smith pulled over to park. She said, "Don't turn around, it may be the police."*

*At that point, the car behind them pulled up alongside Smith's car and "they started shooting." Breyanna looked over and saw a gun. Shatera heard nine or 10 gunshots. Wallace, who had been getting out of the car, ducked. Wallace was not injured.*

*Smith died from multiple gunshot wounds. She suffered four wounds, one of which was fatal. One projectile was recovered from Smith's body.*

*Breyanna fell over onto the car seat and "blacked out," although she could still hear. She heard Shatera screaming. Breyanna was struck by bullets in the jaw and right leg. She was not able to speak for a month due to the wound to her jaw. The left side of her body was partially paralyzed for two or three months.*

*Shatera was hit three times. She suffered wounds in her arm, elbow, and thigh. The bullet that hit her arm traveled through her stomach and pierced her lung, causing it to collapse.*

*Police found 10 cartridge casings in the area near the shooting. All of the cartridge casings were "9-millimeter Luger caliber designation." Nine of the cartridge casings were fired from the same firearm. The tenth was of a different manufacture and tests proved inconclusive as to whether it was from the same weapon. It was "not in great shape." There was nothing to indicate that it was fired from a different weapon*

3

*either.*[3]

     *Three fired bullets and two bullet jacket fragments were collected from Smith's vehicle.  Microscopic comparison showed that four of the items were fired from the same gun.  It could not be determined whether the smallest jacket fragment was fired from the same weapon.  A bullet retrieved from Smith's body and collected by the coroner was fired from the same firearm as the other bullets.*

     *A bullet path analysis showed that the paths of the bullets hitting the car were consistent with the victims' vehicle being stationary and the suspect's vehicle driving alongside the victims' vehicle while someone in the suspect's vehicle fired rounds from a semiautomatic weapon.  One gun from the suspect's car could produce the bullet pathways in Smith's car.*

     *On December 8, 2008, in the early morning hours after the shooting, Los Angeles Police Detective Gerardo Pantoja interviewed Wallace at Harbor UCLA Medical Center.  Wallace described the suspect's vehicle as a 1990-era, champagne-colored, Nissan Maxima with tinted windows.*[4]  *Wallace said he saw three to four male Blacks in the vehicle.  At 10:35 a.m. on that day, Wallace telephoned Detective Pantoja and said the car was not a Maxima but rather an Infinity that looks like an Altima.  He said it was champagne-colored or beige.  Detective Pantoja testified that the lights in the area of the shooting were "milky yellow white lights."  These lights often distort the color of a car.  At some point, Detective Pantoja showed Wallace a photograph of an Infiniti J30 that he had downloaded from the Internet.  It was of a color similar to the one described by witnesses.  Wallace stated that the photograph depicted the vehicle involved in the shooting and was also the vehicle that "banged on him two days before the shooting on 102nd and Figueroa."*

---

[3]    *Breyanna told police there were two shooters wearing ski masks.  Shatera also believed that there may have been two shooters.*

[4]    *Breyanna described the car as a dark, four-door vehicle.*

4

*On December 22, 2008, Detective Pantoja and Detective Tingirides again interviewed Wallace.  The interview was audio recorded, and portions were played for the jury.  Wallace said that when his mother was driving him to the gas station, a car was driving close to Smith's vehicle and then it turned.  When they were returning from the gas station, a car ran a red light and drove up behind them and caught up to them.  The car put on the high beams.  Wallace and his family thought it was the police.  As Smith was pulling over to the curb to let Wallace out, all he heard was gunshots. Wallace heard the windows break at approximately the fifth shot, and he heard his sister screaming.  Wallace said he hopped out of the car and ran around to stop his mother's car because it had begun to roll.  Wallace was sure it was one gun that fired.  He could tell by the way it sounded.  Wallace thought he heard someone say, "Lanes," but was not sure if it was just something in his head.  The suspect's car did not drive off quickly. Detective Pantoja showed Wallace a photographic lineup in which Eric Pious, who was known as Big E-Mack, was the focus.  As the detective extracted the lineup from his notebook, Wallace pointed to Pious's photograph and said, "That's him, that's him." He said that Pious was the person he saw drive by and say "Denver Lanes" while he made a gang sign from a car on December 5, 2008.  It was the same car he saw drive off when his mother was killed, and the shots came from that car.  Wallace did not indicate that Pious was involved in the shooting of his mother on December 7.[5]*

*1. Lancaster's Recorded Statements in Custody*

*On September 2, 2009, Los Angeles Police Detective Nathan Kouri arranged to*

---

[5]       *Wallace was an uncooperative witness at trial.  He testified that he did not recall speaking with police on two occasions, and he denied making the statements he made to the detectives.  He did not know where the shooting was coming from because he was ducking.  When asked what a snitch was, he replied, "I don't know.  You tell me." He denied being a member of the 94th Street Hoover Criminals gang, and he did not know who the gang's enemies were.  He denied signing the photographic lineup and writing on it.*

5

*have Lancaster placed in a cell with Kerry Smith, a fellow Denver Lanes gang member, at the Los Angeles County Jail.  Detective Kouri was conducting a homicide investigation in which Kerry[6] was the focus.  Kerry was known as Baby Bat Mite and was in state prison at the time.  Timothy Booten was known as Big Bat Mite.  The conversations in the cell that Kerry and Lancaster shared were recorded.  Detective Kouri listened to the recording and gleaned that the two were talking about the homicide at 102nd Street and Denver Street.  He gave the information to one of the investigators in the Smith homicide.*

*The prosecutor played three audio files from the three-hour recording.  The conversation was riddled with gang jargon, which had to be interpreted by Detective Samuel Marullo, who testified as a gang expert.  During the conversation, Lancaster stated, "On Lanes, when we go to the boos on DLB I take Little E-Mack on Lanes Big E-Mack, Bat Mite, on Lanes, and Shady all in Bat Bar they all in this Blood on Lanes they go on 102nd ….."  Lancaster continued, "Boolaid from Boova out there."  And, "I was all ready, Little E-Mack, I was gonna do it on Lanes but the homies already wanted Little E-Mack … on Lanes they give Blood the burner this nigga want Lady Menlo to drive Blood on Lanes I'm like hell no Blood on Lanes get in the bar Blood … go over there on Lanes do our stuff ….."  Lancaster told Kerry that someone visited him in Wayside and brought a picture of E-Mack and asked him if he knew E-Mack.  Lancaster denied knowing Eric Pious (E-Mack) and Timothy Booten (Bat Mite).*

*Detective Marullo explained that "on Lanes" meant that Lancaster was "putting it on the gang as a kid or even an adult [would] say I put that on my mom, I put that on everything I love, I put that on God."  Detective Marullo said that "Bat Mite" was Timothy Booten.  "Bat Bar" referred to Bat Mite's car.  "Shady" referred to Brandon Scott.  First letters with a "k" sound (as in Crips) are replaced by the letter "b" as a way*

---

[6]     *We refer to Kerry by his first name, since his last name is the same as that of the murder victim.*

6

*of showing disrespect from the Bloods.  The "H" in "Hoover" was also replaced by a "b" as a show of disrespect.  "Bool Aid" was a disrespectful way of referring to Kool Aid, who was Wallace.*

*Lancaster later told Kerry that "the nigga Boolaid from Boova" was sitting in the back seat behind the passenger.  "It's his Blood mama and his sister in the passenger seat he about jump on out of there."  Lancaster said he was telling "Little E give me the burner[7] Blood, give me the burner Blood" over and over.  Little E said, "I got it this mine."  "Blood mama pull up behind a bar like she was parking.  Fucked up on Lanes pull up right beside her stop boom Blood light the bar up … this nigga shooting on Lanes he's sparking the bar up on Lanes all you hear is screaming and shit on Lanes don't even get Blood.  Killed Blood's mama she got hit in the neck … and Blood's two sisters get hit."  Wallace "didn't get grazed or nothing."  Based on this conversation, Detective Marullo was of the opinion that Lancaster was driving the car from which the shots came.  Part of this opinion was based on the amount of detail revealed in the conversation.  Lancaster complained that Boolaid was "going around telling everybody that Lil E-Mack is the one that did it on Lanes."*

*In a discussion about tattoos, Lancaster told Kerry that Little E-Mack acquired a tattoo of a name beginning with an "H" and did not want it "whacked out."  Kerry confirmed that this was said by Little E-Mack.  Lancaster said "that's brazy."[8] Lancaster informed Kerry that Big E-Mack had changed Lancaster's name to "KG."  He indicated that this meant he was "little Killa Gum from Denver Lanes."*

---

[7]     *A burner is a gun.*

[8]     *James has a tattoo reading "Hangout III" with the dates "11-28-86 – 5-31-08."  The "H" in "Hangout" was not crossed out.  Derrick Chambers, a Denver Lanes gang member also known as Baby Hangout, was killed on May 31, 2008.  "Hangout III" referred to Baby Hangout.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*2. Testimony of Therowna Davenport*

*Therowna Davenport testified that she was Lancaster's girlfriend and had a child with him. She began dating Lancaster when she was 17. . . .*

*At trial, Davenport testified that she knew Lancaster belonged to Denver Lane Bloods and had the moniker Baby Ru. . . .*

*At the time of a May 7, 2009 interview with Detectives Tingirides and Pantoja, Davenport drove an Infiniti I30 that her grandmother owned. She would lend the car to Lancaster. It was "goldish, tannish" in color.*

*. . .*

*5. Detective Flaherty's Information*

*On December 10, 2008, Detectives Pantoja and Tingirides met with Detective Patrick Flaherty, who was an expert on the Denver Lanes gang. Flaherty knew James as a Denver Lanes gang member with the monikers Little B and Little E-Mack. Flaherty had never heard of any other Denver Lanes member being referred to as Little E-Mack. Eric Pious was always known as E-Mack. Flaherty stated that gang members sometimes gave one moniker to the police but used a different moniker "within the hood." Flaherty was also familiar with Lancaster as a member of the Denver Lane Bloods.*

*. . .*

*B. Gang Evidence*

*In his testimony as a gang expert, Detective Marullo stated he was familiar with the Denver Lane Bloods, and the gang had more than 200 members. The primary activities of the gang included murders, attempted murders, shootings, possessing handguns, selling narcotics, and robberies. The gang claimed territory bordered by 105th Street, Vermont, the 110 freeway, and 120th Street. Lancaster was a member of the Denver Lane Bloods with the monikers Baby Ru Blood and KG. Lancaster had a tattoo between his eyes with the letters "K" and "G." KG stands for "Killa Gum." The word "gum" was a disrespectful way of referring to a Broadway Gangsta gang member.*

8

Lancaster had numerous tattoos testifying to his membership in the Denver Lane Bloods. Marullo testified that James was a member of the Denver Lane Bloods and had the monikers Little B and Little E-Mack.  Marullo was not aware of anyone other than James being known as Lil E-Mack.  James had tattoos attesting to his membership in the Denver Lanes gang.  The December 7, 2008 shootings occurred in Hoover territory. Wallace was a member of the Hoover gang with the moniker Kool Aid.  Wallace had several Hoover gang tattoos on his body.

Detective Marullo stated that if someone in a gang took undeserved credit for a mission, he would be disciplined, and the false statements would also be "an obstacle to gang members' aspirations, and that is to be respected in the gang and respected as a gangster."  A gang member who said someone was a shooter when that person was not would suffer the same consequences.

In response to a hypothetical matching the facts of this case, Detective Marullo stated that he was of the opinion that the Smith shooting was done for the benefit of, at the direction of, and in association with a criminal street gang.  He said it was a "classic gang drive-up shooting."  The crimes were done in association with a criminal street gang, since two members of the Denver Lane Bloods committed the crimes together.  The crimes were done at the direction of the gang because the tape-recorded conversation showed that the "big homies actually wanted one of the two Denver Lane Blood gang members to do the shooting."  The crimes benefitted the Denver Lane Bloods because it was "an attempt to eliminate an enemy gang member."  The shooting also served as a deterrent because it showed that the gang would "shoot up your whole family to get at you and to get at the Hoovers."  The crimes would also bring respect to the gang. Detective Marullo testified that the crimes would uplift the status of an individual gang member. The driver in the hypothetical could claim this mission as well as the shooter. The driver went "boldly into the enemy's neighborhood so that the passenger in this hypothetical could shoot and kill."

9

*II. Defense Evidence*

   . . .

     *B. Lancaster's Evidence*

     *Lancaster testified in his own behalf.  He became a member of the Denver Lanes when he was around 14 or 15 years old, along with his twin brother.  Lancaster admitted that he went by the names Killa Gum and Baby Ru.  To Lancaster, Detective Marullo is "a crooked dude."  The detective once spoke to Lancaster about his brother getting a life sentence and said, "You next."  Lancaster said that Marullo was "lying about a lot of stuff" and Lancaster believed Marullo was trying to get him sentenced to life.  Lancaster said he regretted getting the gang tattoos, but he did it to "fit in."  He was "through with gang banging" because it "messed up" his life, his mother was getting old, and he had not yet touched his son, who was almost three years old. Lancaster said that, when speaking with Kerry, he was bragging about something he did not do.  He was not the driver and was not involved in the shooting.  Lancaster knew that James was not involved in the shooting either.  Lancaster said that killing someone's mother was "taking gang banging to a whole other stand" and that he was "not with that at all" because it was "not right."*

     *Lancaster heard about the shooting before he was in custody, and "people talk in county jail."  He bragged about the shooting so no one would "mess" with him. Timothy Booten, or Bat Mite, also told him about the shooting.*

     *Lancaster did not know James to be Lil E-Mack.  James is Little B, YB, or Young Blood.  The person Lancaster knew as Lil E-Mack had stolen from the Denver Lanes and they did not want him around anymore.  Lancaster believed James did not want to take on that name because of that.*

*III. Prosecution Rebuttal Evidence*

     *On January 23, 2007, Los Angeles Police Officer Tim Pearce and his partner filled out a field identification card for James.  James said he was Little B from Denver Lanes.  When Detective Pantoja talked to Detective Flaherty on December 10, 2008,*

*Flaherty said that James' moniker was Lil E-Mack.  At that time, Detective Pantoja had no reason to believe that, nine months later, Lancaster would be in a cell stating that he was the driver and Lil E-Mack was the shooter.  Detective Pantoja told Lancaster that a mother and her daughters had been shot, but did not specify where on their bodies they had been shot.  He did not mention where Boolaid was seated in the car.  Detective Pantoja downloaded information from the telephone that was booked as James's property at the county jail.  There were a lot of photographs of James on the phone.*
(LD 10 at 3-14.)

### III.

### PROCEDURAL BACKGROUND

The jury convicted Petitioner of second degree murder (Cal. Pen. Code ["PC"] § 187(a)(1), count 1) and willful, deliberate, and premeditated attempted murder (PC §§ 664/187(a), count 4).  The jury found with respect to both counts that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang (PC § 186.22(b)(1)).  (LD 1, 2 Clerk's Transcript ["CT"] 379-80, 383-84, 391-92).

Petitioner raised two issues on appeal, alleging: (1) the trial court denied his state and federal constitutional right to trial by jury and created a structural defect in the proceedings requiring reversal when it reopened jury selection after the trial jury was sworn; and (2) Petitioner's rights to a unanimous 12-person verdict under the California Constitution was violated, as was his right to a trial by jury, because all 12 jurors did not physically appear in court to affirm the verdicts. (LD 5 at 32-70.)

On April 4, 2014, the California Court of Appeal issued a reasoned opinion affirming the judgment of conviction.  (LD 10; <u>People v. Lancaster</u>, 2014 Cal. App. Unpub. LEXIS 2419 (Cal. App. 2d Dist. Apr. 4, 2014).)  Petitioner filed a petition for review in the California Supreme Court.  (LD 11.)  On June 11, 2014, the California Supreme Court summarily denied review.

(LD 13.)  Petitioner did not file any state court collateral challenges.  (Dkt. 1 at 3.)

## IV.

## CLAIMS

Petitioner raises two claims in his federal habeas petition that roughly correspond with those he raised on direct appeal:

1.      "The trial court denied [Petitioner] his state and federal constitutional right to trial by jury and created a structural defect in the proceedings requiring reversal of the judgment of conviction when it exceeded its authority by reopening jury selection after [Petitioner's] jury was sworn;" and

2.      "[Petitioner's] right to a unanimous twelve-person verdict under Cal. Const., Art. I was violated and his right to a jury trial under the Sixth Amendment to the United States Constitution were violated because all 12 jurors did not appear in court to affirm the verdicts, rendering the verdicts invalid."  (Dkt. 1 at 5, 11.)

## V.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

12

determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d).  The "clearly established Federal law" that controls
federal habeas review of state court decisions consists of holdings (as opposed
to dicta) of Supreme Court decisions "as of the time of the relevant state-court
decision."  Williams v. Taylor, 529 U.S. 362, 412 (2000).

Although a particular state court decision may be both "contrary to" and
"an unreasonable application of" controlling Supreme Court law, the two
phrases have distinct meanings.  Id. at 391, 413.  A state court decision is
"contrary to" clearly established federal law if the decision either applies a rule
that contradicts the governing Supreme Court law, or reaches a result that
differs from the result the Supreme Court reached on "materially
indistinguishable" facts.  Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam);
Williams, 529 U.S. at 405-06.

State court decisions that are not "contrary to" Supreme Court law may
be set aside on federal habeas review only "if they are not merely erroneous,
but an *unreasonable* application of clearly established federal law, or based on
an *unreasonable* determination of the facts."  Early, 537 U.S. at 11.  A state
court decision that correctly identified the governing legal rule may be rejected
if it unreasonably applied the rule to the facts of a particular case.  Williams,
529 U.S. at 406-10, 413 (e.g., the rejected decision may state the Strickland
standard correctly but apply it unreasonably). To obtain federal habeas relief
for such an "unreasonable application," a petitioner must show that the state
court's application of Supreme Court law was "objectively unreasonable."
Woodford v. Visciotti, 537 U.S. 19, 24-27 (2002); Williams, 529 U.S. at 413.
An "unreasonable application" is different from an erroneous or incorrect one.
Williams, 529 U.S. at 409-10; Woodford, 537 U.S. at 25.

The same standard of objective unreasonableness applies where the

13

petitioner is challenging the state court's factual findings under 28 U.S.C. § 2254(d)(2).  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding").

As the Supreme Court has explained:

Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [i.e., where there was no reasoned state court decision], could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

Harrington v. Richter, 562 U.S. 86, 102 (2011).  Furthermore, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  Id. at 103.

For purposes of applying AEDPA's standard of review, the California Court of Appeal decision on direct appeal (LD 10) constitutes the relevant state court adjudication on the merits.  Berghuis v. Thompkins, 560 U.S. 370, 380 (2010) (where state supreme court denied discretionary review of Court of Appeal's decision on direct appeal, the decision on direct appeal is the relevant state court decision for purposes of the AEDPA standard of review).

14

**VI.**

**DISCUSSION**

**A.**   **Ground One: "Unswearing" of the Jury**

     **1.**   **Relevant Trial Court Proceedings**

On April 25, 2012, the prosecutor and the defense accepted the jury and the 12 regular jurors were sworn. (LD 3, 2 Reporter's Transcript ["RT"] 2452.) Immediately afterward, counsel approached the bench and defense counsel said, "I could be wrong, but did No. 4 mention something about wanting to talk." (Id.) The court apparently remembered this as well, saying, "Yeah, No. 4." (Id.) The prosecutor reminded the court that he had requested the court to delay swearing in the jurors until a further Evidence Code 402 hearing was held, but agreed that the issue with Juror No. 4 needed to be addressed as well. (2 RT 2452-53.) The court stated, "God. Remember you didn't want me to swear them in." (2 RT 2453.) The prosecutor stated, "The court launched into it so quickly, I didn't want to interrupt in front of the panel. And the People and counsel are all willing to stipulate that they be deemed unsworn at this point." (Id.) The prosecutor and defense counsel both stipulated to the "unswearing." (Id.) The court stated, "And there is a stipulation that they be deemed unsworn, and I'm going to accept the stipulation, because I think we all agreed that they would not be sworn at this point." (2 RT 2454.)

Juror No. 4 told the court that she was a student, and her GPA would be compromised if she missed exams. (LD 4, 3 Supplemental RT ["SRT"] 650.) She had been told it was too late for a tuition refund. (Id.) The prosecutor stated that, if he had known of her situation, he would have exercised a peremptory challenge on this juror, because he did not want a distracted juror. (3 SRT 652-53.) After a discussion, the trial court allowed the prosecution to exercise a peremptory challenge on Juror No. 4. (2 RT 2454.) Another juror

15

was selected, and both sides accepted the panel.  (Id.)

The trial court pointed out that only two jurors were left for selection of alternates and asked if there were any objections to either of them.  (2 RT 2455.)  The prosecutor said he would exercise a peremptory challenge to one of them.  (Id.)  The court then decided to select three alternate jurors from a new group of prospective jurors.  (2 RT 2456.)  The court agreed not to swear in the jurors until the pending Evidence Code section 402 hearing was finished.  (Id.)  After further voir dire, pursuant to a mutual agreement, the parties stipulated to three alternate jurors.  (2 RT 2458.)  On the following day, the trial court held the hearing.  (3 RT 2701-35.)  After pre-instructing the jury, all of the jurors, both regular and alternate, were sworn.  (3 RT 2736-43.)

## 2.    Court of Appeal Opinion

The Court of Appeals began its analysis by summarizing the California statutes that govern the jury selection process in California trial courts, as follows:

> *Under the Trial Jury Selection and Management Act (the Act), a trial court has no discretion to reopen jury selection after the trial jury has been impaneled, even if the alternate jurors have not been sworn.  (Code Civ. Proc., § 190 et seq.; People v. Cottle (2006) 39 Cal.4th 246, 249 (Cottle).)  The Act added Code of Civil Procedure sections 226 and 231, subdivision (a), the latter of which provides that "'[a] challenge to an individual juror may only be made before the jury is sworn.'"  (Cottle, at p. 255, quoting Code Civ. Proc., § 226, subd. (a).)  Once the jury was sworn, the trial court could discharge [a juror] only if there existed good cause for his [or her] removal.  (Code Civ. Proc., §§ 233 & 234; Pen. Code, § 1089.)"  (Cottle, at p. 255.)  Although a trial court lacks authority to reopen jury selection once the 12 trial jurors are sworn, the court is not without recourse if a juror becomes unable to serve.  "Code of Civil Procedure sections 233 and 234 and Penal Code section 1089 provide for the removal of a juror upon a showing of good cause."  (Cottle, at p. 259.)*  (LD 10 at 22.)

16

Applying these rules to the facts, the Court of Appeals determined that the trial court erred in re-opening the jury selection process after the panel had been sworn, but that the error was harmless, as follows:

> Under _Cottle_, once the jurors were sworn, the trial court lacked authority to reopen jury selection as to those trial jurors. (_Cottle_, _supra_, 39 Cal.4th at p. 255.) _Cottle_ named no exceptions to this rule. _Cottle_ reasoned that, if a party were allowed to use peremptory challenges to members of the jury after the jury was sworn, but before the alternates were selected, gamesmanship would be encouraged. (_Id._ at p. 257.) "For example, if a favorable juror was selected as an alternate, a party would then try to challenge a member of the jury so that the alternate could replace the juror. Nothing in the legislative history suggests an intention to create such a scheme." (_Ibid._) Since reopening jury selection was clearly error, it is necessary for us to decide whether defendants' statutory rights under the Act were waived by defendants.
>
> At the outset, we disagree that defendants had to consent personally to waiving or forfeiting a violation of their statutory, nonconstitutional, rights. "'The right to request a mistrial or to elect to continue with a particular jury is not one of the constitutional rights deemed to be so personal and fundamental that it may only be personally waived by the defendant.'" (_People v. Mata_ (2013) 57 Cal.4th 178, 185-186.) We conclude defendants waived any objection because their respective counsel expressly agreed to the procedure followed by the trial court. (_People v. Benavides_ (2005) 35 Cal.4th 69, 88; _People v. Ervin_ (2000) 22 Cal.4th 48, 73.)
>
> It was Lancaster's counsel himself who reminded the court that they had forgotten about Juror No. 4's request to speak to the court about her service. Immediately upon everyone's realizing that the jury had been prematurely sworn, the court asked if the attorneys wanted to stipulate, and Mr. Sanabria said he was fine with that. The prosecutor, Mr. Sanabria, and Mr. Klink immediately stipulated that the jurors "be deemed unsworn" before the court and the parties learned what Juror No. 4's problem was and before the prosecutor made any mention of the fact that the juror's concern

17

*about missing classes made her an undesirable juror in his eyes.  When the trial court allowed the prosecutor to exercise a peremptory challenge to Juror No. 4, there was no objection from either defense counsel.  When Juror No. 15 was seated in Juror No. 4's place, the prosecutor and both attorneys immediately accepted the jury panel as constituted.  The prosecutor and both defense counsel then selected the alternate jurors by mutual agreement.  We find no opportunity in these occurrences for the prosecutor to practice gamesmanship, which is one of the principal dangers that the Act sought to guard against.  The prosecutor did not thereafter exercise another peremptory challenge on any of the jurors.  Although "the parties are not free to waive, and the court is not free to forego, compliance with the statutory procedures which are designed to further the policy of random jury selection, equally important policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced." (People v. Visciotti (1992) 2 Cal.4th 1, 38.)  It is unfair to the trial judge and to the prosecution to allow defendant to take advantage on appeal of an error that could have been corrected easily at trial.  (People v. Saunders (1993) 5 Cal.4th 580, 590.)*

*Even though the trial court, pursuant to Cottle, should not have reopened voir dire after the jury was sworn, defendants must show prejudice in order for their convictions to be reversed.  (Cal. Const., art. VI, § 13; see also People v. Ervin, supra, 22 Cal.4th at p. 73.)  Defendants have made no showing that a more favorable result for them was reasonably probable.  (Cottle, supra, 39 Cal.4th at pp. 255, 258 [error constitutes a statutory violation rather than a denial of a constitutional right]; People v. Anzalone (2013) 56 Cal.4th 545, 555-557 (Anzalone) [applicable standard is whether appellants would have obtained a more favorable result in the absence of the error].)  Lancaster makes no specific claim of prejudice.  James claims that he suffered prejudice because reopening voir dire allowed the prosecutor to place on the panel a juror whom he thought was more favorable than Juror No. 4.  As stated, the record reveals no specific advantage was accorded the prosecutor by the mutually agreed-upon arrangement.  (LD*

10 at 22-24.)

### 3.   Analysis

The Court of Appeal did not address Petitioner's Sixth Amendment claim in its reasoned opinion.[9]  Because no state court gave reasons for denying that claim, the Court has independently reviewed the record to determine whether there was any reasonable basis to deny relief on the Sixth Amendment grounds raised by Petitioner.[10]  See Richter, 562 U.S. at 98.

This case presents an interesting question arising from an unusual set of circumstances: Is there clearly-established federal law on whether it violates a defendant's Sixth Amendment rights if a trial judge—with the consent of the prosecution and defense counsel—"unswears" an empaneled jury shortly after swearing it in, in order to continue voir dire?  There is not.  The clearly-established federal law that does exist shows a reasonable basis for rejecting Petitioner's arguments.

Petitioner contends that the trial court's actions violated his "constitutional right to a jury trial since the unauthorized opening of jury

---

[9]    As a lead-in to both of his claims, Petitioner references the equal protection clause.  (Dkt. 1 at 5, 11.)  Petitioner did not raise an equal protection claim on direct appeal, making it unexhausted.  This Court reviews this unexhausted snippet of a claim on the merits under 28 U.S.C. § 2254(b)(2).  Petitioner's passing reference to the equal protection clause does not set forth a sufficiently specific claim for federal habeas relief.  The Court rejects the claim as conclusory.  See Mayle v. Felix, 545 U.S. 644, 655–56 (2005).

[10]    Respondent argues that both of Petitioner's claims are procedurally defaulted because Petitioner failed to object at trial.  (See Dkt. 15 at 16-19, 29-30.)  Because the merits of Petitioner's claims can easily be resolved against Petitioner, the Court declines to address Respondent's procedural default argument in the interests of judicial economy.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997).

selection effectively invalidated or discharged [his] sworn jury and thus amounted to [his] waiver of a jury trial." (Dkt. 1 at 6.) Petitioner premises his argument on his right to the <u>particular</u> jury that was first sworn. (<u>Id.</u>) Petitioner also argues that while his counsel may have stipulated to the "unswearing," a jury trial may be waived only if consent to the waiver is given personally by the defendant—and because he did not personally waive his right to a jury trial, his conviction must be reversed. (<u>Id.</u> at 6-7.)

The Sixth Amendment guarantees a right to an impartial jury and applies to Petitioner through the Fourteenth Amendment. U.S. Const. amends. VI, XIV; <u>Willams v. Florida</u>, 399 U.S. 78, 86 (1970). Petitioner has not shown any violation of these Sixth Amendment rights. Taken to its logical conclusion, Petitioner would argue that mistrials also violate the Sixth Amendment, which is clearly not the case. The Sixth Amendment does not guarantee Petitioner a right to a particular tribunal. It guarantees him an impartial one. Petitioner does not contend that any juror was biased, and he cannot contend that he did not receive a jury trial. There is no reason to believe that Juror No. 15 (who replaced Juror No. 4) was any more or less favorable toward Petitioner than Juror No. 4. Petitioner's counsel had no objection to the "unswearing," no objection to the peremptory challenge to Juror No. 4, and no objection to Juror No 15. There does not appear to have been any gamesmanship by the prosecution. Rather, the trial court made an innocuous mistake that it quickly rectified to all parties' satisfaction. Petitioner did not waive his right to an impartial jury, or to a trial by jury, because he was never deprived of that right. The question of whether Petitioner alone, and not his counsel, could have waived that right is consequently moot.

While Petitioner does not cite the double jeopardy clause, it is worth noting that Petitioner does have a Fifth Amendment right to a particular tribunal in limited circumstances. The Fifth Amendment provides that no

person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has held that a defendant is not placed in jeopardy until "a jury is empaneled and sworn." Serfass v. United States, 420 U.S. 377, 388 (1975). "The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury. That interest was described in Wade v. Hunter . . . as a defendant's 'valued right to have his trial completed by a particular tribunal.'" Crist v. Bretz, 437 U.S. 28, 35-36 (1978) (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)). Petitioner, however, was never placed in double jeopardy. The double jeopardy clause "protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 306-07 (1984). Petitioner does not fall into any of these three categories, and therefore his "right to have his trial completed by a particular tribunal" was never implicated. See U.S. v. Trigg, 988 F.2d 1008, 1010 (9th Cir. 1993) (holding that where a jury had been sworn but the judge dismissed three jurors and conducted additional voir dire and a second swearing-in, double jeopardy had attached but its protection did not apply because there was no "event, such as an acquittal, which terminates the original jeopardy").

As a final matter, Petitioner argues that the trial court's "unswearing" of the jury and re-opening of voir dire was structural error, requiring reversal of his conviction. (Dkt. 1 at 6.) Structural errors are "structural defects in the constitution of the trial mechanism." Brecht v. Abrahamson, 507 U.S. 619, 629 (1993). These errors go to the framework within which judicial proceedings are conducted and "infect the entire trial process," requiring "automatic reversal of the conviction." Id. at 629-30. The Supreme Court has "found an error to be

structural, and thus subject to automatic reversal, only in a very limited class of cases," such as the complete denial of counsel, a biased trial judge, racial discrimination in the selection of the grand jury, denial of self-representation, or denial of a public trial.  Neder v. United States, 527 U.S. 1, 8 (1999) (citations and internal quotation marks omitted).  Harmless error, on the other hand, "'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'"  Brecht, 507 U.S. at 629 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)).

This Court need not decide whether the alleged constitutional error was structural or not, because as explained above, there was no constitutional error.  There was a reasonable basis to conclude that Petitioner's Sixth Amendment rights were not violated, and habeas relief is therefore not merited on this ground.[11]  See Richter, 562 U.S. at 98.

**B.** **Ground Two: The Juror Heart Attack**

    **1.** **Relevant Trial Court Proceedings**

On the day the jury reached its verdict, the trial judge was absent.  (9 RT 6601.)  A different judge was assigned to handle the matter.  (Id.)  The jury had reached a verdict the preceding day and had lodged those verdicts with the court clerk or bailiff.  (Id.)  The trial court stated that there had been an in-chambers conference regarding Juror No. 6, who had suffered a heart attack the night before and was hospitalized.  (9 RT 6602.)  The juror's wife had conveyed the information to the court.  (Id.)  At the court's request, Petitioner's counsel stated for the record that one suggestion was that, if there

---

[11]    To the extent that Petitioner argues ineffective assistance of trial counsel for stipulating and failing to object to the "unswearing" (Dkt. 1 at 9), that claim fails.  See Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989) (holding that an attorney is not ineffective for failing to raise a meritless legal argument).

was a guilty verdict, they poll the 11 jurors who were present and communicate with Juror No. 6 via telephone at a later point or in person if he was healthy enough.  (9 RT 6602-03.)

The court stated that it was best to contact Juror No. 6 by telephone that day.  (9 RT 6604.)  The court had suggested this procedure to all parties off the record and everyone agreed that it would be a good idea.  (Id.)  The court clerk had called Juror No. 6's wife, who stated that Juror No. 6 was in the ICU unit where there was no telephone.  (Id.)  She was on her way to see him and agreed to give her cell phone to her husband so that he could converse with the court.  (Id.)

The court stated that it was important that Juror No. 6 have the mental capacity to speak to them and that there would "be some obvious questions about his ability to fully understand what he did yesterday if in fact the verdict was reached yesterday and he voted on it."  (Id.)  The court noted that it would be necessary to find out if the juror was able to speak to them and if he was of sound mind.  (Id.)  If so, he could be polled telephonically.  (Id.)

Shortly thereafter, the court received a three-page fax from the hospital. (9 RT 6605.)  Page 2 consisted of a letter stating: "To Whom It May Concern. The purpose of this letter is to verify that the juror, his name is (Juror No. 3508), and his date of birth … was admitted to Presbyterian Intercommunity Hospital on May 18, 2012, at 2:00 a.m.  This hospitalization was unexpected. His duration is unknown.  Thank you for your understanding regarding his jury duty absence."  (Id.)  Page 3 was a note stating, "(Juror No. 3508) was taken by ambulance on May 18th at 2:00 a.m. and is hospitalized at this time, and henceforth unable to report to court."  (Id.)

After reading these communications, the court suggested everyone wait to take the verdict until Juror No. 6's wife arrived at the hospital and they could determine his medical condition, his ability to verbalize and think, and

his ability to tell them what his verdict was.  (Id.)  They could then poll the remaining 11 jurors.  (9 RT 6606.)  The court stated, "I would rather get him first before dealing with the 11."  (Id.)  The parties agreed to this procedure.  (Id.)

James's counsel suggested asking the attending physician whether the juror had been given pain medication.  The court agreed that this was also a "prudent course of action."  (Id.)  The prosecutor pointed out that medical personnel would probably not release any information over the telephone.  (Id.)  The court concluded that the juror could convey to them "how he's feeling and how he's thinking," and the court and the parties could "get a sense from the patient."  (9 RT 6607.)

When the jurors were brought into the courtroom, the court informed them that the formerly-presiding judge was unavailable and that Juror No. 6 had a "medical emergency yesterday or last night."  (9 RT 6611-12.)  The court said, "We want him to participate in this proceeding."  (9 RT 6612.)  The court reviewed the verdict forms and noted that one of them was ambiguous "because it [was] filled out as to both.  And so one is signed, one is not, but they're both filled out.  So I don't know what you mean by that."  (Id.)  The court asked the jury to retire to the jury room and determine which form reflected their verdict.  (Id.)  The court told the jury, "When you come back, we'll get No. 6 on the telephone. He's there ready to speak to us telephonically, and we'll continue accordingly."  (9 RT 6613.)  The jurors returned to the jury room.  (Id.)

When the jurors returned to the courtroom, the court announced, "The panel is back in the courtroom.  The alternates are present.  The defendants are present.  All counsel are present.  And Juror No. 6 is on the speaker phone; is that correct?"  Juror No. 6 replied, "Yes, I am, Juror No. 6."  (Id.)  The court remarked, "I see the jurors are relieved.  They're smiling to hear your voice."

24

(Id.)

The court asked Juror No. 6 if he was able to "intelligently understand" the proceedings and whether he had the "mental faculties to understand what we are doing at this moment." (Id.) Juror No. 6 replied, "I do, yes, I do." (Id.) The court asked the juror, "And are you feeling any—that your head is not clear, that you cannot think, that you cannot understand what I'm saying or what we are doing?" (Id.) Juror No. 6 replied, "No, I absolutely understand." (Id.) The court then asked, "And likewise, yesterday when the verdicts were reached, and you—and they were all finalized and submitted to the foreperson, and then they got sealed, did you understand what you were doing, and you understood what had transpired, and you had your full mental capacity to do that?" (9 RT 6613-14) Juror No. 6 stated, "Yes, I did. And I absolutely understood, yes." (9 RT 6614.) The court asked the parties if they had any additional questions for Juror No. 6, and the parties said they did not. (Id.)

The court stated that it had reviewed the verdict forms, and they were signed and dated and filled out correctly. (Id.) The court handed them to the clerk, who read the verdicts. (Id.) Upon completing the reading, the clerk asked, "Is this your verdict, so say you one, so say you all?" (9 RT 6626.) The jurors answered collectively in the affirmative, and Juror No. 6 stated, "I do." (9 RT 6626-27.) The court then asked the clerk to poll the jury beginning with Juror No. 6. When asked if this was his verdict as to each count as to each defendant, Juror No. 6 replied, "It is." (9 RT 6627.)

### 2.  Court of Appeal Opinion

The Court of Appeals first discussed relevant California law, as follows:

*As noted in Anzalone, a party must object to an incomplete polling to preserve the issue for appeal. (Anzalone, supra, 56 Cal.4th at p. 550, citing Keener v. Jeld-Wen, Inc. (2009) 46 Cal.4th 247, 262-270.) "'[T]he basis for the requirement of an objection to*

25

asserted imperfections in the polling of a jury concerning its verdict is no different from the basis for requiring objections to other equally important procedural matters at trial …. The requirement of an objection is premised upon the idea that a party should not sit on his or her hands, but instead must speak up and provide the court with an opportunity to address the alleged error at a time when it might be fixed.'" (*Anzalone*, at p. 550.) *Anzalone* also held that the failure to comply with [PC] section 1149 does not constitute structural error. (*Id.* at p. 557.) In the absence of structural error, the Watson [*People v. Watson* (1956) 46 Cal.2d 818] standard for assessing prejudice is controlling. (*Anzalone*, at p. 555.)

In the instant case, counsel for both defendants not only did not object, they fully acquiesced and announced their satisfaction in the method devised by Judge Bacigalupo for including Juror No. 6 in the polling. Therefore, both defendants have forfeited the right to raise the issue on appeal.

Even if this court were to reach the merits of the issue, however, we would find any error harmless. "[S]ection 1149 also requires that when the jury returns after reaching a verdict, the court or clerk must ask 'whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same.'" (*Anzalone*, *supra*, 56 Cal.4th at p. 551.) The court in *Anzalone* explained that a foreman's oral declaration is sufficient acknowledgement of the verdict. (*Ibid.*) The court asked the foreman whether the jury had reached a verdict, to which the foreman clearly answered in the affirmative. It is only in the individual polling that an irregularity occurred.

Although a complete failure to orally acknowledge a written verdict in open court would normally invalidate the verdict (*People v. Thornton*, *supra*, 155 Cal.App.3d at pp. 856-860), individual polling errors do not require reversal in the absence of a showing of prejudice. (*People v. Masajo* (1996) 41 Cal.App.4th 1335, 1339-1340.) Even on a cold record, it is clear that Juror No. 6 was alert and very much aware of his role as a juror. He demonstrated no equivocation when he was asked to affirm the

*verdict. Although there was no formal identification of his name on the record, he stated that he was Juror No. 6. The hospital had confirmed the juror's name and birth date in the letter it sent to the court. The juror's wife had communicated with the court, and it was her cell phone that was used to telephone the court. The record indicates that the other jurors recognized his voice.*

*As for the initial discrepancy in the verdict forms noted by Judge Bacigalupo, it appeared to be a clerical mistake in that the jury had filled out a verdict but had signed another verdict form. The foreman corrected the discrepancy by scratching out his signature on the incorrect form. Thus, there was no difference in the verdicts reached the night before and the verdicts read out in the presence of the jurors. Accordingly, in view of Juror No. 6's strong affirmation that the verdicts read in court were the verdicts he and the other jurors had reached during deliberations, defendants have failed to establish that they suffered prejudice by his telephonic appearance.*

(LD 10 at 29-31.)

With regard to Petitioner's federal claims, the California Court of Appeal ruled as follows:

*With respect to defendants' allusions to a violation of their due process rights, "not every violation of the state and federal right to a jury trial is a structural defect requiring reversal without regard to whether the defendant suffered actual prejudice." (People v. Mil (2012) 53 Cal.4th 400, 411.) Accordingly, we conclude that in this case, noncompliance with section 1149 was procedural error, subject to harmless error review. (People v. Watson, supra, 46 Cal.2d at p. 836.) And for the reasons set out previously, we believe defendants suffered no miscarriage of justice as a result of the error.*

(Id. at 31.)

### 3. Analysis

A trial that began with a premature swearing-in and subsequent "unswearing" was bookended by a juror heart attack in between the verdict and polling. These were, to say the least, highly irregular occurrences.

27

Petitioner argues that the latter event was not merely irregular, but violated his Sixth Amendment right to a jury trial and his due process rights.  Petitioner premises this argument on his right to a "unanimous twelve-person verdict" and the fact that one juror was physically absent from the courtroom at the time of polling.  (Dkt. 1 at 11.)

Petitioner's argument fails.  The Sixth Amendment and due process clause do not require a unanimous verdict in state criminal trials.  See Johnson v. Louisiana, 406 U.S. 356, 358-363 (1972); see also Frank v. Chavez, 65 F. Supp. 3d 677, 689 (N.D. Cal. 2014) ("Petitioner claims that the discharge of Juror No. 6 for cause during deliberations violated his right to a unanimous jury verdict under the California constitution, a right constitutes a liberty interest protected by the federal constitutional right to due process. . . . Petitioner cites no Supreme Court authority . . . that a defendant has a liberty interest protected by the federal right to due process in a unanimous verdict. The absence of such authority means that . . . he cannot obtain habeas relief under AEDPA.")  Furthermore, the Supreme Court has held that a 12-person panel is not a necessary ingredient for "trial by jury" under the Sixth Amendment in state criminal cases.  Williams v. Florida, 399 U.S. 78, 86 (1970).

In addition, and as the Court of Appeal implicitly found, Petitioner did receive a unanimous, 12-person verdict.  The trial court received a letter from the hospital containing the juror's name and birth date.  (9 RT 6605.)  The man on the telephone confirmed that he was Juror No. 6.  (9 RT at 6613.)  The court noted that the jurors were "smiling" and appeared to be "relieved" to hear Juror No. 6's voice, indicating that they recognized his voice.  (Id.)  Finally, Juror No. 6 stated he was able to "absolutely understand" the proceedings.  (9 RT at 6613-14.)  Petitioner did not question Juror No. 6's competence to proceed at the time, or his identity.  (9 RT at 6614.)  Petitioner

argues now that the man who identified himself as Juror No. 6 on the telephone might not, in fact, have been Juror No. 6, and that he might have been under the influence of medication that would have rendered him unable to confirm that he had delivered guilty verdicts the day before.  (Dkt. 1 at 19-20.)  There is nothing in the record to support this speculative argument, and as set out herein, much to controvert it.

The Court of Appeal's decision was neither contrary to, nor an unreasonably application of, clearly-established federal law.  Petitioner has cited to no clearly-established federal law—and this Court has found none—holding that each of the jurors in a criminal jury trial must be physically present in the courtroom at the time of polling, following a verdict, rather than appearing by telephone when one of them has a pressing reason to do so.  The most Petitioner can do is point to California Penal Code section 1149, enacted in 1872, which states that, when a jury has reached a verdict, "they must be conducted into court by the officer having them in charge.  Their names must then be called, and if all do not appear, the rest must be discharged without giving a verdict."[12]  (See Dkt. 1 at 13.)  This alleged violation of state procedural law does not state a claim cognizable on federal habeas review.  See Poland v. Stewart, 169 F.3d 573, 584 (9th Cir.) ("Federal habeas courts lack jurisdiction . . . to review state court applications of state procedural rules."); see also Little v. Crawford, 449 F.3d 1075, 1083 n.6 (9th Cir. 2006) ("We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question.").

---

[12]   As required by the statute, Juror No. 6 did "appear"—by telephone.  He simply was not conducted into the courtroom.

# VI.

## CONCLUSION

IT IS THEREFORE ORDERED that the Petition is DENIED.  Let judgment be entered dismissing this action with prejudice.

Dated: <u>April 12, 2016</u>

*Karen E. Scott*

KAREN E. SCOTT
United States Magistrate Judge